IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2014 JAN 31  AM 10: 06
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
       DEPUTY

| | |
|---|---|
| DR. MARY LOUISE SERAFINE, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § | |
| TIM F. BRANAMAN, Chairman, Texas § | No. 11-cv-01018-LY |
| State Board of Examiners of § | |
| Psychologists, in his official capacity; § | |
| and DARREL D. SPINKS, Executive § | |
| Director, Texas State Board of § | |
| Examiners of Psychologists, in his § | |
| official capacity, § | |
| § | |
| Defendants. § | |

Plaintiff's Post-Trial Reply

Mary Louise Serafine, *Pro Se*
P.O. Box 4342
Austin, Texas 78765
512-220-5452
mlserafine@gmail.com

# TABLE OF AUTHORITIES

## CASES

*Friedman v. Rogers*, 440 U.S. 1 (1979).............................................................. 2

*Jaffee v. Redmond* 518 U.S. 1 (1996)................................................................. 2

*Pickup v. Brown*, 728 F.3d 1042, 1050 (9th Cir. 2013)........................................2

## STATUTES AND REGULATIONS

Code of Federal Regulations, Title 21, Vol. 4, sec. 210.3.................... 6

Texas Occ. Code, sec. 501.003(c)(2)................................................... 1

## OTHER SOURCES

Ahn, H., and Wampold, B. E., Where oh where are the specific ingredients? A meta-analysis of component studies in counseling and psychotherapy, Journal of Counseling Psychology, 48: 3: 251-257.............................................................................................. 6

Christensen, A. and Jacobson, N.S., "Who (or What) can do psychotherapy: The status and challenge of nonprofessional therapies." Psychological Science, 1994, 5:1: 8-14. .......................... 3

Eysenck, H. J., The effects of psychotherapy: an evaluation, Journal of Consulting Psychology, 1952, 16: 5: 319-324......................3

Floyd, M., Scogin, F., McKendree-Smith, N.L. et al., Cognitive therapy for depression: A comparison of individual psychotherapy and bibliotherapy for depressed older adults, Behavior Modification, 2004, 27: 2: 297-318......................................................................... 5

Gleitman, H., Fridlund, A.J., Reisberg, D., Basic Psychology, 5th ed. New York: Norton, 2000...................................................... 6

Gould and Clum, A meta-analysis of self-help treatment approaches, Clinical Psychology Review, 1993, 13: 169-186............... 4

Norcross, Koocher, & Garofalo, Discredited psychological

treatments and tests: A Delphi poll, Professional Psychology Research and Practice, 2006, 37:5:515-522 .......................................... 9

Norcross, J.C. and Koocher, G.P. Psychoquackery: Discredited Treatments in Mental Health and the Addictions. Available at: http://www.e-psychologist.org/printer_friendly.iml?Material_ID=105&Exam_ID= ...................................................................... 9

Stice, E., Burton, E., Bearman, S.K., and Rohde, P., Randomized trial of a brief depression prevention program: An elusive search for a psychosocial placebo control condition, Behaviour Research & Therapy, 2007, 45: 5: 863–876 .......................... 5

Strupp, H.H. and Hadley, S.W., Specific versus nonspecific factors in psychotherapy, Archives of General Psychiatry, 1979, 36:10: 1125-1136 .................................................................. 5

Titov N, Andrews G, Davies M, McIntyre K, Robinson E, et al., Internet treatment for depression: A randomized controlled trial comparing clinician vs. technician assistance, 2010, PLoS ONE 5(6): e10939. doi:10.1371/journal.pone.0010939 .............. 5

Plaintiff responds to the State's Post-Trial Brief, Doc. 87:[1] [2]

    1. <u>The State argues that "The plaintiff cannot transfer her burden of proof to the defendants."</u> The State inescapably stipulated in fact No. 7 that Defendants ordered Plaintiff not to violate *either* the "titling"*or* the "practice aspect" of the Act. *See* Tr. vol. I:11:11-19 and Exh. P-2. The practice aspect of the Act embodies a general prohibition on speech, provided as a service, the breadth of which has few equals in U.S. constitutional history. Its enforcement was specifically ratified at trial by its enforcer's testimony that at most Plaintiff might be allowed to "lecture" [Tr. vol. II:at 108:16-22] and repeatedly in deposition that the breadth of the unauthorized practice of psychology might encompass all weight-loss, smoking cessation, and other advice, depending on a discretionary investigation by the Board that itself that raises constitutional violations. (*See*, e.g., Appendix Tab 1, Exh. P-18, Branaman deposition, *<u>bracketed testimony at pp. 48, 50, 54-56, 57</u>*). Defendants point to no case where the Supreme Court has upheld a prohibition *effective against unlicensed citizens* like Plaintiff on speech and thought alone that relies on a broad government-approved body of knowledge. That the State may

---

    [1] Plaintiff relies on her prior briefing and abbreviations. "Act" means the Psychologists' Licensing Act as previously cited. "Board" means Texas Board of Examiners of Psychologists. "APA" and "TPA" mean the American and Texas Psychological Associations respectively. "FDA" means U.S. Food and Drug Administration. Statutory references are to the Act.

    [2] Plaintiff clarifies that on page 6 of Plaintiff's Post-Trial Brief, Doc. 84, the penultimate paragraph cites separately to both the State's (Dr. Branaman's) broad enforcement intentions under Sec. 501.003(c)(2) and also Dr. Serafine's censored speech of "describing, explaining, and ameliorating behavior."

1

license professions that have a knowledge base is not to say that the State may *invent* professions and fabricate a knowledge base for them where none exists. That is particularly true where, as Defendants' witnesses testified, the purpose may be improper—to confer a "brand" for anticompetitive "marketing" purposes. (*see* Doc. 84 at 16.)

The Act prohibits pure speech about thoughts, beliefs, ideas, and feelings that is not aimed at outcomes affecting the body or any part of the material world, as do the practices of barbers, pharmacists, nurses, surgeons, engineers, or architects. Even where, in a controversial holding, pure speech has been prohibited under a licensing act, the Ninth Circuit was careful to note that the ban applied *only to licensed psychotherapists,* not to the unlicensed. *Pickup v. Brown,* 728 F.3d 1042, 1050 (9th Cir. 2013)(upholding California ban on psychotherapy intended to change a minor's sexual orientation)

2. The State proposes a factual finding that "all states license psychologists under the same terms as in Texas." The State concedes that such a finding would not be dispositive, and its authorities cited [Doc. 72 at 4] are inapposite.[3] Defendants' reliance on purported interstate legislative findings begs the question whether states can legislate away the freedom to do nothing more than talk, advise, counsel, and consult, as a service,

---

[3] *Jaffee v. Redmond* 518 U.S. 1 (1996), 116 S.Ct. 1923, 135 L.Ed.2d 337 concerned interstate "reason and experience" only of states' acceptance of the therapist/client privilege, nothing more. *Friedman v. Rogers,* 440 U.S. 1 (1979), 99 S.Ct. 887, 59 L.Ed.2d 100 established merely that Texas could prohibit optometry businesses from operating under trade names.

2

about "behavior" broadly construed. Plaintiff urges that they may not.

3. <u>The State proposes a factual finding that "the unlicensed practice of psychology poses risks to public health and safety."</u> The question is whether the breadth of the Act can be justified. Psychology is a science in its infancy that has not identified *any* "principles, methods, or procedures" beyond bare cultural norms, much less "established" any that justify allocating to government alone the determination of what may or may not be described, explained or ameliorated about behavior—that is, about the whole of life. *See generally* Plaintiff's expert testimony and Exh. P-19 at Appendix Tab 2.[4] After five decades of intensive research on psychotherapy[5]—the heart of the Act—the prognosis for a body of knowledge in psychology is worse, not better, because of recent discoveries that *untrained* psychotherapists, and books and self-help methods, can ameliorate behavior as well as or better than trained therapists. Tr. vol. I:56-3-5. Christensen and Jacobson [6] summarized, based on repeated meta-analyses involving thousands of subjects as follows:

---

[4] All psychological citations herein were provided to defendants timely before trial and/or were available to be or were cross-examined. Plaintiff's expert opinion was based on her independent analysis of the published results and data, not on the conclusions of the cited authors, which may be different.

[5] Although criticized, Eysenck's classic study in 1952 touched off decades of research on the comparative efficacy or effectiveness of different psychotherapies. *See* Appendix Tab. 3, Eysenck, H. J., The effects of psychotherapy: an evaluation, <u>Journal of Consulting Psychology</u>, 1952, 16: 5: 319-324. Eysenck had reported that data "fail to support the hypothesis that psychotherapy facilitates recovery from neurotic disorder."

[6] Christensen, A. and Jacobson, N.S., "Who (or What) can do psychotherapy: The status and challenge of nonprofessional therapies." <u>Psychological Science</u>, 1994, 5:1: 8-14.

*See* Appendix Tab 4.

1. "Research suggests that paraprofessional therapists [without post-baccalaureate training] usually produce effects that are greater than effects for control conditions and comparable to those for professional therapist treatment."

2. A review of studies previously conducted by Durlak, [Durlak, J., Comparative effectiveness of paraprofessional and professional helpers, Psychological Bulletin, 1979, 86: 80-92], warrants concluding that "[i]n terms of measurable outcome, professionals may not possess demonstrably superior clinical skills when compared with paraprofessionals," that "professional mental health education, training, and experience do not appear to be necessary prerequisites for an effective helping person." Moreover, "clients who seek help from paraprofessionals are more likely to achieve resolution of their problem than those who consult professionals."

3. In a review of peer-reviewed research findings across 475 studies of psychotherapy outcome, there was "no relationship *(r = 00)* between years of therapist experience and therapy outcome" [emphasis in original], and the same result was supported by a later meta-analysis of another 143 studies).

4. A "meta-analysis of 108 well-designed psychotherapy studies with children and adolescents [] found no overall difference in effectiveness between professional therapists, graduate-student therapists, and paraprofessional therapists."

Moreover, contrary to the State's assertions in its Appendix I at para. 3, this can be true even in treating those diagnosed as mentally ill. Tr. vol. III:61:12 to 62:15. For example, Gould and Clum [7] meta-analyzed 40 self-help studies examining 61 treatments and found large treatment effect sizes for self-help interventions and no differences between unassisted self-help and therapist-assisted self-help. The population included people with fears, depression, headache, and sleep disturbances.

---

[7] Gould, R.A. and Clum, G.A., A meta-analysis of self-help treatment approaches, Clinical Psychology Review, 1993, 13: 169-186.

4

Floyd and Scogin et al.[8] found that among depressed older adults, at the follow-up evaluation, there were no differences in improvement between those who received individual cognitive psychotherapy and those who read the book Feeling Good by Burns. *See* Appendix Tab 5.

It should be emphasized that this line of research dates back at least to 1979, when Strupp and Hadley [9] demonstrated that:

> "[p]atients treated by professors showed, on the average, as much improvement as patients treated by ['highly experienced'] professional therapists" where the patients had had elevations on the depression, anxiety, and social introversion scales of the Minnesota Multiphasic Personality Inventory, [and] [b]y traditional diagnostic categories, would be classified as neurotic depression or anxiety reactions. Obsessional trends and borderline personalities were common."

Other studies have found similar results. [10] [11]  This research does more than raise

---

[8] Floyd, M., Scogin, F., McKendree-Smith, N.L. et al., Cognitive therapy for depression: A comparison of individual psychotherapy and bibliotherapy for depressed older adults, Behavior Modification, 2004, 27: 2: 297-318.

[9] Strupp, H.H. and Hadley, S.W., Specific versus nonspecific factors in psychotherapy, Archives of General Psychiatry, 1979, 36:10: 1125-1136.

[10] Stice, E., Burton, E., Bearman, S.K., and Rohde, P., Randomized trial of a brief depression prevention program: An elusive search for a psychosocial placebo control condition, Behaviour Research & Therapy, 2007, 45: 5: 863–876 (randomized trial showing that although cognitive-behavioral therapy was superior to control group in depression prevention, so were the four intended placebos: (1) a non-therapy supportive-expressive group, (2) reading the book *Feeling Good* by Burns, (3) journaling at home, and (4) expressive writing at the researchers' lab; subjects were high-risk adolescents with elevated depression scores).

[11] Titov N, Andrews G, Davies M, McIntyre K, Robinson E, et al., Internet treatment for depression: A randomized controlled trial comparing clinician vs. technician

ambiguity or uncertainty about this Act. It is fatal to it. For well more than a decade even introductory textbooks have had to inform psychology majors that the knowledge base in psychotherapy is still being developed, if it is not in complete disarray. *See*, for e.g., Gleitman, H., Fridlund, A.J., Reisberg, D., Basic Psychology, 5th ed. New York: Norton, 2000 (comparing modern role of psychotherapists to that of a "wise aunt" and noting "[w]ise aunts are in short supply today" at 702; citing source that compares psychotherapy to "the purchase of friendship" at 694). Phrasing the problem in terms of the FDA's distinction between active and inactive ingredients that are required in medical tests of pharmaceuticals, it is truth, not metaphor to assert that psychology has yet to establish its unique, active ingredients.[12] [13]

---

assistance, 2010, PLoS ONE 5(6): e10939. doi:10.1371/journal.pone.0010939 Available at: http://www.plosone.org/article/info%3doi/10.1371/journal.pone.0010939 (internet-based treatment for major depressive disorder finding no difference between clinician-assisted treatment and treatment facilitated by less trained technician; results comparable to face-to-face treatment). [N.B.:Peer-review status of this study is unknown.]

[12] *See* 21 CFR 210.3(7)("[a]ctive ingredient means any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease...."). 

[13] *See* Ahn, H., and Wampold, B. E., Where oh where are the specific ingredients? A meta-analysis of component studies in counseling and psychotherapy, Journal of Counseling Psychology, 48: 3: 251-257 (meta-analysis of studies that compared bona fide psychotherapeutic treatments against treatments that were similar, but lacked at least one component considered theoretically important to the treatment's success, or contained an additional component not theoretically relevant to the treatment; results showed that across 27 separate studies, there were no difference in benefit between bona fide treatments and altered treatments; concluding "(t)he results cast doubt on the specificity of psychological treatments").

6

Nothing in these facts poses any threat to the State's protection of the vulnerable (school children, the mentally impaired, the abused, the suicidal) or the captive (the imprisoned, those hospitalized), because the State's elected branches may pass constitutionally valid laws and fund and implement any program, with any guidelines, in schools, hospitals, courts, and prisons, or in other times, places, and manners as are reasonably justified for a particular purpose.  It is another question entirely, however, when the State claims that, in order to do that, it needs to invent a professional license under the rubric "psychology" (or naturopathy or fortune-telling, as a few jurisdictions have similarly attempted) to evade the constitutional scrutiny required when it reaches so far into the speech of the *unlicensed.  See*, e.g., Sec. 501.003(c)(2).  Against this backdrop, it is the State's burden, at any level of scrutiny, to show that the practice of psychology *as defined by the Act,* poses some risk, some State interest in this massively broad prohibition.

To counter the evidence at trial, Defendants belatedly offer [Doc. 87 at 2-3] the Sunset Commission's 2005 opinion, of which it "advised the Legislature,"*id*. at 2, based on unknown evidence, if any. The other evidence in Defendants' Appendix I, paras. 2, 3, 4, and 5 is anecdotal, unsupported by specific facts, irrelevant, or spins the testimony.

4. <u>The State proposes a factual finding that "the field of psychology provides sufficient standards to guide state regulation."</u>  On opening statement, the State promised this Court: "We think the evidence will actually show that there is such a thing as the

field of psychology. There's a fair amount of consensus on what's effective and what isn't." Tr. I: 8:7-9. Psychologists, such as Plaintiff, who have contributed scientifically to psychology and have had to explain to introductory psychology students what is known about cognition, human development, and psychotherapy would dearly love to know what "sufficient standards" for "what's effective and what isn't" the field of psychology provides that warrant the State's control of all describing and explaining of behavior and addressing its normality.

The State offered only conclusory testimony of two practitioners who did not specify a single "standard" that has guided them and gave no testimony that they kept records or even informally compared client outcomes under any standards to determine what is effective and what isn't. Defs. Appendix I at paras. 2, 3, 4. Although Defendants' expert is estimated to have "provided psychological services to at least 8,000 people" [*id.* at para. 2], Defendants did not specify what could be gleaned from providing such services (valuable as they may be), without making any comparisons among "services" offered apparently to *different clients* at a rate that amounts to one new client every day, four days a week for 40 years. Plaintiff challenges the State to describe at least some truly psychological "standards" or "principles" that rise to anything like the knowledge base of professions that touch the body or the physical, material world.[14]

---

[14] Dr. Branaman's testified, *see infra,* that "across the profession" the knowledge base of ESTs ("empirically supported treatments") is "emphasized," but in fact it is not widely taught. See Woody et al., Empirically supported treatments:10 years later, The

Psychology is entirely mental.

Against this, Plaintiff's expert testified [Tr. vol. I:66:8 to 68:22] that when highly qualified psychological experts are given back-to-back surveys *intended to measure and generate consensus* (the "Delphi poll method") about "what's effective and what isn't," the results show that mainstream, expert psychologists do not agree even on what constitutes absolute quackery in the field. . Norcross and his colleagues describe their rationale for conducting such surveys as follows (*see* Appendix Tab 6) :[15] (Note: Dr. Branaman's reference to the "evidence-based practice"appears at Tr. vol. II:128:1-7. Plaintiff's expert's rebuttal on the same topic appears at Tr. Vol. III:64:13 to 65:25.)

> "The...evidence-based practice (EBP) movement...has provoked enormous controversy within organized psychology, and...little consensus currently exists.... (citation). We believe that it might prove to be as useful and probably easier to establish what does *not* work—discredited psychological treatments and tests." (emphasis in original)

The Norcross group, in two studies, surveyed 251 mental health experts, including fellows of the APA. The surveys asked for experts' opinions about more than 50

---

Clinical Psychologist, 2005, 58:4: 5-11, 11 (surveys find that "most of the treatments with robust empirical support are taught...by fewer than half of the [doctoral] training programs." Ten years after the effort was initiated, teaching of ESTs was "down to only a handful out of 26" such treatments, and "many accredited programs still provide[d] no training in ESTs.").

[15] Norcross, Koocher, & Garofalo, Discredited psychological treatments and tests: A Delphi poll, Professional Psychology Research and Practice, 2006, 37:5:515-522, and Norcross, J.C. and Koocher, G.P. Psychoquackery: Discredited Treatments in Mental Health and the Addictions . Online article available at: http://www.e-psychologist.org/printer_friendly.iml?Material_ID=105&Exam_ID=

psychological treatments and 30 psychological tests pre-determined systematically by the researchers to be discredited. Results showed that quackery regarded as discredited by many experts was held to be acceptable to many others. Disastrously, differences were driven, *to a statistically significant degree*, by gender and theoretical orientation such as Freudian, cognitive-behavioral, etc. In a second round of surveys, showing the experts results obtained from their colleagues did not meaningfully create consensus. Tr. vol. I:66:8 to 68:22.

   5. <u>The State argues that "the definition of 'psychologist' does not invalidate the laws at issue.</u>" Dr. Branaman conceded at deposition that "there certainly are many branches of psychology...." Appendix Tab 1, Exh. P-18, p. 41 at 23-25. Dr. Serafine is a psychologist in at least three branches and need not invent new language to identify herself. The State's purpose could be achieved with "Licensed Clinical Psychologist."

   7. <u>The State argues that "the challenged statute does not abridge the plaintiff's political speech rights.</u>" What started this case is the State's aggressive enforcement action against Plaintiff during her political campaign, a matter of weeks before election day. No one lodged complaints against Plaintiff except for the Board and the TPA.

   8. <u>The State argues that "the challenged statute is not overbroad."</u> Assuming the police power allows some licensing of psychologists, this particular statute's titling and practice aspects capture protected speech. It is therefore unconstitutionally overbroad.

DATED this 31st day of January 2014

Respectfully submitted,

*/s/MaryLSerafine*
Mary Louise Serafine, *Pro Se*
P.O. Box 4342
Austin, Texas 78765
512-220-5452
mlserafine@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January 2014, I served the foregoing by U.S. mail to:

James C. Todd
Assistant Attorney General
Office of the Attorney General
General Litigation Division-019
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
jim.todd@oag.state.tx.us

/s/ MaryLSerafine
Mary Louise Serafine, Plaintiff